1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6         FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   NISSAN FIRE AND MARINE INSURANCE
    COMPANY LTD.; HITACHI DATA
9   SYSTEMS CORP.,                              No. C 02-2516 JSW

10

11                  Plaintiffs,                 **FINDINGS OF FACT AND**
                                                **CONCLUSIONS OF LAW**
12       v.

13   BAX GLOBAL INC.;CATHAY PACIFIC
     AIRWAYS, LTD.,
14
                    Defendants.
15   _____/

16       This action came on for a bench trial which began on March 28, 2006 and lasted one

17   court day.  Plaintiffs The Nissan Fire and Marine Insurance Company, Ltd. ("Nissan") and

18   Hitachi Data Systems Corp. ("Hitachi") (collectively, "Plaintiffs") appeared by their counsel,

19   David Salentine, and Defendant BAX Global, Inc. ("BAX") appeared by its counsel, Paul

20   Arenas and Paul Nowell.  Prior to trial, in lieu of having live witness, the parties stipulated to

21   what the witnesses of each party would have testified.  The Court, having considered the

22   stipulated testimony and exhibits admitted into evidence, as well as the arguments of counsel,

23   hereby makes the following findings of fact and conclusions of law pursuant to Federal Rule of

24   Civil Procedure 52(a).

25                            **FINDINGS OF FACT**

26       Hitachi shipped 18 cartons of cargo on BAX air waybill No. CHG17066781 dated April

27   5, 2001 from Plainfield, Indiana to Hong Kong.  (Stipulated Facts ("Stip. Fact"), No. 1; Ex. 1.)

28   The cargo was shipped with no declared value.  (Stip. Fact, No. 2.)  Hitachi insured the cargo

United States District Court

For the Northern District of California

1    with Nissan.  (*Id.*, No. 3.)  Nissan compensated Hitachi $122,645.33 for the damage to the

2    cargo.  (*Id.*, No. 4.)  The Nissan/Hitachi insurance policy had an insurance deductible of

3    $10,000.00.  (*Id.*, No. 5.)

4    　　　　The Cargo was received by BAX from Hitachi in Plainfield, Indiana.  (*Id.*, No. 6.)

5    Thereafter the cargo was trucked to BAX's facility near but not on the grounds of the

6    Indianapolis International Airport and thereafter to Chicago O'Hare International Airport.  (*Id.*,

7    No. 7.)  The cargo did not enter onto an airport premises until reaching Chicago O'Hare.  The

8    BAX facility at Chicago O'Hare is within the boundaries of that airport.  (*Id.*)

9    　　　　Upon BAX's delivery of the cargo to Cathay Pacific at O'Hare, Cathay Pacific issued to

10   BAX Cathay Pacific's air waybill no. 160-89992022 dated April 7, 2001.  (*Id.*, No. 9.)  The

11   Cargo was then flown from Chicago to Hong Kong aboard Cathay's flight CX085.  This flight

12   has a scheduled stop at Anchorage, Alaska.  (*Id.*, No. 10.)

13   　　　　One of the 18 pieces of cargo was discovered damaged upon arrival in Hong Kong.  (*Id.*,

14   No. 11.)  The Court finds that the damage occurred within the boundaries of an airport or while

15   engaged in international air travel.[1]  The weight of the damaged carton and contents was 481

16   kilograms.  (Stip. Fact, No. 12.)  The damaged package contained a "disk controller" unit.  (*Id.*,

17   No. 13.)  The weight of a single Hitachi Data Systems 9960 is at most 1,062 kilograms when

18   fully assembled.  (*Id.*, No. 14.)  The weight of two Hitachi Data Systems 9960 Disk Subsystems

19   is at most 2,124 kilograms.  (*Id.*, No. 15.)

20   　　　　The BAX air waybill states on the face:  "It is agreed that the goods described herein are

21   accepted in apparent good order and condition (except as noted for carriage) SUBJECT TO

22   THE CONDITIONS OF CONTRACT ON THE REVERSE HEREOF."  (*Id.*, No. 16; Ex. 1.)

23   The waybill contains no notations of bad order of the cargo.  (Stip. Fact, No. 16.)

24   _____

25   　　　[1]  This finding is based on upon the rebuttable presumption under Article 18(3) of the
     Warsaw Convention that the damage occurred during air transportation.  *See Read-Rite Corp.*
26   *v. Burlington Air Express, Ltd.*, 186 F.3d 1190, 1194 (9th Cir. 1999).  BAX bears the burden
     of presenting evidence to rebut the presumption and demonstrate where the damage actually
27   occurred.  *See Washington Int'l Ins. Co. v. Distribution Specialists Inc.*, 1996 WL 50232, *2
     (S.D.N.Y. Feb. 8, 1996); *Royal Ins. Co. of Amer. v. Air Express Int'l*, 906 F. Supp. 218, 219-
28   20 (S.D.N.Y. 1995).  The Court concludes that BAX did not provide sufficient, credible
     evidence to demonstrate that the damage occurred within the United States *before* the
     entering the boundaries of an airport.

United States District Court

For the Northern District of California

The BAX air waybill further states:

1.    ... and "Carrier" includes all air carriers that carry the goods hereunder or perform any other services related to such air carriage including [BAX]. For the purposes of this contact, [BAX] includes employees, agents, servants, or representatives of [BAX].

2.    In tendering the shipment for carriage, the Shipper agrees to these TERMS AND CONDITIONS OF CONTRACT, and agrees that no employee, agent, ... may modify or waive them.  This [BAX] Air Waybill is NON-NEGOTIABLE, and has been prepared by or on behalf of the Shipper who, by accepting the Air Waybill, ratifies the correctness.

...

5.    <u>LIMITATION OF LIABILITY</u>

     A.   (1)   The Shipper acknowledges that is has been given an opportunity to make a declaration of the value of the goods in excess of U.S. $9.07 per pound (U.S. $20 per kilogram [or 17 Special Drawing Rights per kilogram when the Montreal Protocol No. 4 applies] and to pay applicable excess charges at the time of tender to [BAX] or the Carrier, and that the sum entered on the face of this Air Waybill as Shipper's Declared Value, if any, constitutes such special declaration of value.

            ...

     B.   Except as the Convention may otherwise require, [BAX]'s liability for all proved damages is limited to U.S. $9.07 per pound (U.S. $20 per kilogram) [or 17 Special Drawing Rights per kilogram when Montreal Protocol No. 4 applies] or Shipper's Declared Value, whichever is greater.  In cases of loss, damage or delay of part of the consignment, the weight to be taken into account in determining [BAX]'s limit of liability shall be only the weight of the package or packages concerned.

...

8.    The agreed stopping places (which may be altered by Carrier in case of necessity) are those places, except the place of departure and the place of destination, set forth on the face hereof or shown in the Carrier's time tables as scheduled stopping places for the route.  Carrier's timetables are hereby incorporated by reference.

...

10.   It is agreed that no time is fixed for completion of carriage hereunder and that [BAX] may, without notice, substitute alternate carriers or air craft. [BAX] assumes no obligation to forward the goods by a specified carrier or over any particular route or routes or to make connection at any point according to any particular schedule, and [BAX] is hereby authorized to select, or deviate from, the route or routes of shipment notwithstanding the same may be stated on the face hereof.

...

15.   ALL CHARGES ARE DUE AND PAYABLE UPON RECEIPT OF BAX GLOBAL'S INVOICE.  Any payment which is past due shall be subject to

an additional charge of 1½% per month of the outstanding balance due or the maximum interest rate permitted by applicable law, whichever is less.

16.    THE SHIPPER, CONSIGNEE, AND OWNER JOINTLY AND SEVERALLY AGREE TO PAY ALL LEGAL AND COLLECTION FEES INCURRED BY BAX GLOBAL IN SECURING PAYMENT FOR ALL CHARGES RELATED TO THE SHIPMENT OR ENFORCING ANY PORTION OF THIS CONTRACT.

...

19.    To the extent that it is not governed by the Convention or by federal law, this contract will be construed pursuant to the laws of the State of California, United States of America.

(*Id*., No. 17; Ex. 1.)

The damaged package was returned from Hong Kong to Chicago under BAX air waybill No. HEH106941 dated May 5, 2001.  (Stip. Fact., No. 18., Ex. 11.)  Plaintiffs had the damaged package trucked from Chicago to Hitachi's facility at Plainfield, Indiana.  (Stip. Fact., No. 18.)  Hitachi inspected and tested the damaged package at the Plainfield facility and determined that the piece could not be repaired at a cost less than the original invoiced price of $132,645.33.  (Stip. Fact, No. 19; Ex. 2.)  Hitachi had the damaged piece disposed of as scrap.  (Stip. Fact., No. 19.)  Hitachi located a replacement piece and had that piece built, configured, and tested at the Plainfield facility.  Hitachi then shipped the replacement piece to Hong Kong.  (*Id*., No. 19.)

Defendant Cathay Pacific Airways, Ltd settled Plaintiffs' claim against it for $15,000.00.  (*Id*., No. 20.)

**CONCLUSIONS OF LAW**

The Warsaw Convention is an international treaty governing the liability of air carriers engaging in international air travel.  *See* Warsaw Convention for the Unification of Certain Rules Relating to International Transportation by Air, October 12, 1929, art. 1, 49 Stat. 3000, T.S. No. 876 (1034), *reprinted in* note following 49 U.S.C. § 40105.  Based on the Court's conclusion that BAX failed to rebut the presumption that the damage occurred on the grounds of an airport or during air transportation, the Warsaw Convention applies to this case.

**A.     Determining Which Version of the Warsaw Treaty Convention Applies.**

The Warsaw Convention was modified by The Hague Protocol.  *See* Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air

4

1   signed at Warsaw on 12 October 1929, Sept. 28, 1955, 478 U.N.T.S. 371.  The United States

2   did not ratify The Hague Protocol before the Warsaw Convention was amended again by the

3   Montreal Protocol No. 4.  *See* Montreal Protocol No. 4 To Amend the Convention for the

4   Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw at 12

5   October 1929 as Amended by the Protocol Done at The Hague on 28 September 1955, 2145

6   U.N.T.S. 36.  On September 28, 1998, the United States ratified the Montreal Protocol No. 4.

7   The Montreal Protocol became effective as to the United States on March 4, 1999.  *Id*., 2145

8   U.N.T.S. at 44.  Article XVII of Montreal Protocol No. 4 provides that ratification of Montreal

9   Protocol No. 4 by a State that, such as the United States, was not yet a party to The Hague

10   Protocol, "shall have the effect of accession to the Warsaw Convention as amended at The

11   Hague, 1955, and by Protocol No. 4 of Montreal, 1975."  2145 U.N.T.S. at 44, art. XVII(2).[2]

12       The parties dispute whether, at the time the air waybill was signed in April 2001, the

13   United States was bound by the original Warsaw Convention, or the Warsaw Convention as

14   amended by The Hague Protocol.[3]  BAX contends that by ratifying the Montreal Protocol No. 4,

15

16       [2] "[I]n 2002, the Department of State acknowledged 'the difficult question of whether
    the United States, by reason of its adherence to Montreal Protocol No. 4 became a party to
17   The Hague Protocol and therefore entered into treaty relations under The Hague Protocol
    with other countries party to that instrument (but not to Montreal Protocol No. 4).'"  *Avero*
18   *Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 83 (2d Cir. 2005) (quoting Letter of
    Submittal by Secretary of Sate Colin L. Powell, June 15, 2002, S. Treaty Doc. 107-14, at ix.
19   President Bush re-transmitted The Hague Protocol to the Senate for "advice and consent."
    *Id*.  The Senate approve The Hague Protocol on July 31, 2003.  President Bush ratified The
20   Hague Protocol effective December 14, 2003.  *See* U.S. Dep't of State, *Treaties in Force* 350
    (2004).
21
        [3] BAX argues that because Plaintiffs initially argued that the Warsaw Convention as
22   amended by The Hague Protocol applied and the Court granted partial summary judgment on
    this basis, Plaintiffs should be judicially estopped from arguing now that the original Warsaw
23   Convention applies.  Judicial estoppel "generally prevents a party from prevailing in one
    phase of a case on an argument and then relying on a contradictory argument to prevail in
24   another phase."  *Pegram v. Herdrich*, 530 U.S. 211, 277 n.8 (2000).  "Judicial estoppel is an
    equitable doctrine that is intended to protect the integrity of the judicial process by preventing
25   a litigant from playing fast and loose with the courts."  *Wagner v. Professional Engineers in
    California Government*, 354 F.3d 1036, 1044 (9th Cir. 2004) (internal quotations omitted).
26   However, if the party was not successful in a prior proceeding, the "party's later inconsistent
    position introduces no risk of inconsistent court determinations ... and thus poses little threat
27   to judicial integrity."  *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001) (internal citation
    and quotations omitted).  In this case, the Court initially granted Plaintiffs' motion for partial
28   summary judgment, but upon BAX's motion for reconsideration, the Court vacated its order
    granting partial summary judgment.  Thus, Plaintiffs were not successful on their motion for

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  the United States also acceded to The Hague Protocol.  The Court must determine whether the

2  United States, by ratifying the Montreal Protocol No. 4, consented to be bound by one treaty,

3  namely the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of

4  Montreal, 1975, or by two treaties: (1) the Warsaw Convention as amended at The Hague, 1955,

5  and (2) the Montreal Protocol No. 4.

6      The best evidence of a treaty's purpose and the parties' intent is the language of the

7  treaty.  *U.S. v. Stuart*, 489 U.S. 353, 372 (1989).  The Montreal Protocol No. 4 provides:  "As

8  between the Parties to this Protocol, the Warsaw Convention as amended at The Hague in 1955

9  and this Protocol shall be read and interpreted together as *one single instrument* and shall be

10  known as the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of

11  Montreal, 1975."  2145 U.N.T.S. at 43, art. XV (emphasis added).  The Montreal Protocol No. 4

12  further provides: "Ratification of this Protocol by any State which is not a Party to the Warsaw

13  Convention or by any State which is not a Party to the Warsaw Convention as amended at The

14  Hague, 1955, shall have the effect of accession to the Warsaw Convention as amended at The

15  Hague, 1955, and by Protocol No. 4 of Montreal, 1975."  *Id.* at 44, art. XVII(2).

16      The Second Circuit, in *Avero*, concluded these provisions demonstrated that by ratifying

17  the Montreal Protocol No. 4, a State "consent[ed] to be bound by *one instrument* consisting of

18  the combination of three related treaties."  *Avero*, 423 F.2d at 84 (emphasis added).  In contrast,

19  the district court in *G.D. Searle & Co. v. Federal Express Corp.*, 248 F. Supp. 2d 905, 908

20  (N.D. Cal. 2003), considered the language in Article XVII(2) to be evidence of consent to

21  accede to the Warsaw Convention as amended by The Hague Protocol, separate from the

22  amendments to the Warsaw Convention by the Montreal Protocol No. 4.[4]  The court in *G.D.*

23

24  partial summary judgment.  Accordingly, the doctrine of judicial estoppel is inapplicable.

25      [4]  The Court in *G.D. Searle* also relied on a footnote in *Motorola, Inc. v. Federal
   *Express Corp.*, in which the Ninth Circuit stated "The Hague Protocol did not enter into force
26  for the United States until the Montreal Protocol No. 4 was ratified by the Senate on
   September 28, 1998 and became effective on March 4, 1999."  308 F.3d 995, 999 n.6 (9th
27  Cir. 2002).  However, in *Motorola*, the shipment at issue occurred before the United States
   ratified the Montreal Protocol No. 4, and thus the issue of whether by ratifying the Montreal
28  Protocol No. 4 the United States also acceded to the Warsaw Convention as amended by The
   Hague Protocol was not before the court.  *Id.*

*Searle* did not consider the language in Article XV that the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975 shall be known as "one single instrument." This Court agrees with the Second Circuit's interpretation of the plain language of the Montreal Protocol No. 4, and thus, concludes that ratification of the Montreal Protocol No. 4 evinces an intent to be bound by a *single instrument* known as "the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975." By ratifying the Montreal Protocol No. 4, the Court finds that the United States did not demonstrate an intent to be bound by the Warsaw Convention as amended at The Hague, 1955, separate from the amendments made by the Montreal Protocol No. 4.

Thus, as of the date of the shipment at issue in this case, the United States had not ratified or acceded to the Warsaw Convention as amended by The Hague Protocol. Accordingly, the Court will apply the original Warsaw Convention to this case.

**B.      Weight Limitations on BAX's Liability.**

"The [Warsaw] Convention creates a presumption of air carrier liability, but, in turn, substantially limits that liability." *Insurance Co. of North America v. Federal Express Corp.*, 189 F.3d 914, 917 (9th Cir. 1999) (citing Warsaw Convention, arts. 18, 22(2).) If applicable, the Convention limits an air carrier's liability to $9.07 per pound. *Id.* However, to invoke the protection of this limited liability, a carrier must comply with the procedural and substantive provisions of the Warsaw Convention. *Id.*

Articles 8 and 9 of the Warsaw Convention govern the issuance of air waybills. Article 8 enumerates a list of seventeen "particulars" which an airway bill must contain, including "[t]he agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity." *See* Warsaw Convention, art. 8(a)-(q). If an air waybill fails to comply with the particulars set forth in Article 8, the air carrier is not entitled to the limitations on liability provided by the Convention. *See id.*, art. 9.

BAX relies on *Insurance Co. of North America* to argue that the waybill at issue here made clear that there were no "agreed stopping places," and thus, it was not required to list any stopping places. In *Insurance Co. of North America*, the waybill specifically disclaimed any

7

United States District Court

For the Northern District of California

1  agreement as to specific stopping places, stating: "You agree that this shipment may be carried

2  via intermediate stopping places that we deem appropriate." 189 F.3d at 916-17.  Moreover, the

3  FedEx Service Guide incorporated by reference into the waybill provided: "FedEx will

4  determine the routing of all shipments.  There are no agreed stopping places which are agreed to

5  at the time of tender of the shipment.  We reserve the right to divert any shipment in order to

6  expedite its delivery ...."  *Id*. at 917 n.5.  The court found that the text of Article 8(c) only

7  required the air waybill to contain "agreed stopping places" and "the air waybill made it

8  perfectly clear that there were no agreed stopping places."  *Id*. at 918-19.  Accordingly, the court

9  concluded that the carrier did not have any obligation to disclose an intermediate stop in order to

10  retain the protection of the liability limitations.  *Id*. at 919.

11         In contrast to *Insurance Co. of North America* in which the waybill expressly disclaimed

12  any agreement as to stopping places, the waybill at issue here provides that the agreed stopping

13  places are those shown on the face of the waybill or in the Carrier's time tables.  (Ex. 1.)  The

14  waybill also provides that BAX is "authorized to select, or deviate from, the route or routes of

15  shipment notwithstanding the same be stated on the face hereof."  However, this disclaimer does

16  not address stopping places, but rather, only addresses the routes.  As the court noted in *Running*

17  *Bear Farms, Inc. v. Expeditors International of Washington, Inc.*, 2001 WL 102515, *5 (S.D.

18  Ohio 2001), "[u]nder the Warsaw Convention, "routing" and "stopping places" are distinct

19  concepts addressed in separate subsections."  Accordingly, the Court concludes that BAX was

20  required to list the stopping places to maintain the protection of the liability limitations in the

21  Warsaw Convention.  Because the air waybill failed to name Chicago, Illinois as a stopping

22  place, and it is undisputed that the cargo stopped in Chicago, BAX is not entitled to the Warsaw

23  Convention's liability limitations.[5]

24

25  **C.      Attorney Fees.**

26

27        _____

28        [5] Because the Court concludes that BAX is not entitled to the Warsaw Convention's limitations on liability based on its failure list all stopping places, the Court need not address Plaintiffs' additional argument that the air waybill's failure to list the correct airport of departure deprives BAX of the liability limitations.

8

**United States District Court**

For the Northern District of California

1    The Original Warsaw Convention does not address attorneys' fees.  The air waybill

2    provides for attorneys' fees only for BAX.  (Ex. 1.)  Plaintiffs argue that the Court should apply

3    California Civil Code § 1717 to convert the parties' attorneys' fees provision in the air waybill

4    into one that is mutual.[6]  Plaintiffs contends that Article 19 of the airway bill provides support

5    for invoking this provision of the California Civil Code.  Article 19 of the air waybill provides:

6    "To the extent that it is *not* governed by the Convention or by federal law, this contract will be

7    construed pursuant to the laws of the State of California."  (Ex. 1 (emphasis added.)

8    Although the Warsaw Convention is silent with respect to attorneys fees, federal law

9    provides that attorneys' fees may be awarded only if they are "authorized by contract, applicable

10   statute, or other exceptional circumstances."  *In re Bybee*, 945 F.2d 309, 316 (9th Cir.1991)

11   (internal quotations omitted).  Here, the parties' agreement does not authorize attorneys' fees for

12   *Plaintiffs*.  Plaintiffs have not pointed to any statute or other exceptional circumstances

13   warranting attorneys' fees.  Rather, Plaintiffs solely rely on state law, California Civil Code §

14   1717, for their contention that they are entitled to attorneys' fees.  However, because federal law

15   addresses when attorneys' fees may be awarded, Plaintiff's reliance on California law is

16   misplaced.  The Court concludes that California Civil Code § 1717 may not be applied to

17   convert the attorneys' fees provision to one that is mutual.  Accordingly, Plaintiffs are not

18   entitled to attorneys' fees.

19   **D.    Prejudgment Interest.**

20   The parties agree that this Court has discretion to award prejudgment interest, *see*

21   *Motorola, Inc. v. Federal Express Corp.*, 308 F.3d 995, 1008 (9th Cir. 2002), and merely

22   dispute what amount should be awarded.

23   Plaintiffs argue that the Court should award 18% compounded annually, based on clause

24   15 of the air waybill.  The air waybill provides that BAX shall be paid 1½% per month, or 18%

25

26           [6]  California Civil Code § 1717 provides in pertinent part: "In any action on a
     contract, where the contract specifically provides that attorney's fees and costs, which are
27   incurred to enforce that contract, shall be awarded either to one of the parties or to the
     prevailing party, then the party who is determined to be the party prevailing on the contract,
28   whether he or she is the party specified in the contract or not, shall be entitled to reasonable
     attorney's fees in addition to other costs."

1   per year, on any amount past due under the parties' contract, but does not address what

2   prejudgment interest should be paid to Plaintiffs if the products being shipped are damaged.

3   (Ex. 1.)  Thus, the air waybill does not provide support for awarding Plaintiffs 18% prejudgment

4   interest.

5          Plaintiffs argue in the alternative that neither the Warsaw Convention nor federal law

6   address prejudgment interest, and thus, the Court should apply the rate of 10% per year set forth

7   in California Code of Civil Procedure § 3289.  BAX contends the amount should be 4%

8   compounded annually, based upon 28 U.S.C. § 1961.  Although 28 U.S.C. § 1961 sets forth the

9   rate for post-judgment interest, courts have applied this amount to prejudgment interest . *See*

10  *Western Pacific Fisheries v. Proprietors Ins. Co.*, 730 F. 1280, 1289  (9th Cir. 1984) (in

11  maritime case, concluding "measure of interest rates prescribed for post-judgment interest in 28

12  U.S.C. § 1961(a) is also appropriate for fixing the rate for pre-judgment interest in cases such as

13  this, where pre-judgment may be awarded ..."); *see also Hollie v. Korean Air Lines Co. Ltd.*,

14  834 F. Supp. 65, 70 (S.D.N.Y 1993) (applying rate set forth in 28 U.S.C. § 1961 to prejudgment

15  interest in action arising under Warsaw Convention).  The Court concludes that the appropriate

16  rate of prejudgment interest is the rate set forth in 28 U.S.C. § 1961, and thus, awards Plaintiffs

17  prejudgment interest at the rate of 4% compounded annually.

18  **E.     Calculation of Award.**

19         BAX contends that it is entitled to a set-off in the amount of the settlement paid by co-

20  defendant, Cathay Pacific, to Plaintiffs, which was $15,000.  Plaintiffs do not address whether it

21  would appropriate to set-off the damages award.  The Court agrees that BAX is entitled to a

22  $15,000 set-off.  *See Seymour v. Summa Vista Cinema, Inc.*, 809 F.2d 1385, 1389 (9th Cir.

23  1987), *modified on other grounds*, 817 F.2d 689 (9th Cir. 1987).

24         Accordingly, the Court awards Plaintiffs $117,645.33 in damages.  Including

25  prejudgment interest at the rate of 4% compounded annually, the award amounts to $156,184.17

26  as of the date of this Order.

27  ///

28  ///

United States District Court

For the Northern District of California

10

**CONCLUSION**

For the foregoing reasons, the Court finds in favor of Plaintiffs and against BAX, and awards Plaintiffs damages and prejudgment interest in the amount of $156,184.17.

**IT IS SO ORDERED.**

*Jeffrey S White*

United States District Court

For the Northern District of California

Dated: May 11, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California